MARKS et al. v. MARKS et al.

MARKS v. GHOLSON et al.

(Circuit Court, D. Tennessee. June 24, 1896.)

**1. FEDERAL COURTS—JURISDICTION—CITIZENSHIP.**

Rulings of the supreme court of the United States upon the subject of citizenship as a ground of jurisdiction in the courts of the United States restated.

**2. SAME—CHANGE FROM ONE STATE TO ANOTHER.**

When a citizen of one state leaves that state, and goes to another, with the deliberate and final intention of making the latter state his home, it is not necessary, in order to acquire a domicile and citizenship therein, that he should adopt a fixed local residence within such state; but immediately upon arriving therein, especially if his domicile of origin was in such state, he becomes a citizen of such state, and a resident of any district or part of it in which he may for the time being abide.

**3. SAME.**

N. H., a daughter of a citizen of Texas, was born in that state, and resided there until her father's death, in her fifteenth year. She afterwards married one A. M., a citizen of Tennessee, and resided with him in that state, where a son, one A. S. M., was born. A. M. died during this son's minority, and the mother, after remaining for some time in Tennessee, left that state, with the child, for Texas, with the fixed and declared intention of making Texas her home, though without any definite place for a local residence. She was at the time engaged to marry one G., but no time had been set for the marriage. A few days after reaching Texas, at G.'s request, and upon his agreeing, as a condition of her consent, to make Texas his home, she decided to marry G. at once, and did so. *Held,* that the arrival of the mother of the infant, A. S. M., in Texas, her domicile of origin, with the intention of making her home in that state, though at no particular point therein, was immediately effectual to change her domicile and that of her minor child, and to make both citizens of Texas, and, the domicile and citizenship so acquired by the child being unchanged by his mother's subsequent marriage, that such child was accordingly competent to bring suit in a federal court against a citizen of Tennessee, or to remove to the federal court a suit brought against him by a citizen of Tennessee in a state court.

**4. SAME—RESIDENCE—WAIVER OF PRIVILEGE.**

The judiciary act of 1887, as corrected by the act of 1888, provides: "And no civil suit shall be brought before either of said courts against any person by any original process or proceeding in any other district than that whereof he is an inhabitant, but where the jurisdiction is founded only on the fact that the action is between citizens of different states, suit shall be brought only in the district of the residence of either the plaintiff or the defendant." *Held,* that within the meaning of this provision of the act it requires no more to constitute residence than is required in the residence element of citizenship, and that the provision of the act as to the district in which the action shall be brought does not touch the general jurisdiction of the court over the case, but affects only the mode of bringing the defendant within the jurisdiction, and is a personal privilege, which is waived unless the objection is seasonably taken.

**5. SAME—ACTION PENDING IN STATE COURT—COMITY.**

It seems that the pendency of a suit between the same parties and for the same object in a state court does not constitute a good plea to a suit between the same parties and for the same purpose in a court of the United States, but conflict of jurisdiction and embarrassment are avoided by the rule of comity under which the court first obtaining jurisdiction is allowed to proceed in an orderly way to a final disposition of the case.

**6. SAME—REMOVAL OF CAUSE.**
Two suits in equity, between the same parties, and seeking substantially the same objects, were commenced on the same day, the one in a state, and the other in a federal, court. The former was removed to the federal court. *Held* that, as it appeared that jurisdiction first attached in the state court suit, the complainant in the other suit should be given leave to dismiss the same, with liberty to file a cross bill in the first suit, if so advised, and that otherwise the complainant in the first suit might file a plea in the second, setting up the pendency of the former suit, which would be a good defense.

R. H. Burney, for plaintiffs.
W. L. Granbery, for defendants.

CLARK, District Judge.    Mr. Hunt, father of Mrs. Gholson, removed from Tennessee to Texas when a boy, became a citizen of Texas, and married there.    Of the children of this marriage, only one survived infancy, that being Mrs. Gholson.    Mrs. Gholson was born in 1865, and, after the time of her birth, her father and mother, having no house of residence, lived in boarding houses and hotels, not residing in any particular town or county, and not possessing a fixed place of residence or municipal domicile.    Mrs. Gholson's mother died when she was 6 or 7 years old, after which the father and child resided part of the time in Tennessee and part in Texas, the mode of residence continuing to be without a fixed domicile. Texas continued to be the state of Hunt's domicile.    Mrs. Gholson's father died when she was about 15 years of age, and she seems to have received the principal part of her education at Nashville, Tenn. She was traveling in Europe in 1888, when she met Arthur Marks, at Berlin, he being then in the diplomatic service of the United States.    They became engaged, and were married in November, 1888, in Scotland.    Mr. Marks, resigning the consular clerkship, returned to the home of his father, Ex-Governor Marks, and took up his residence at the father's home, "Hundred Oaks," at Winchester, Tenn.    Mr. Marks, her first husband, died in September, 1892, and left, surviving him, one child of the marriage, Albert S. Marks, Jr.    In the progress of events not necessary to be detailed, Albert D. Marks became trustee by deed of all the estate of his brother Arthur, which consisted almost entirely of the personal estate received by him in his marital right by the marriage with Miss Hunt.    After the death of her husband, Arthur H. Marks, the widow spent her time at various places, but treated Hundred Oaks as her home. Texas was her domicile of origin or nativity.    Finally, influenced by reasons not necessary to be given, she determined to remove to the state of Texas with her child, still an infant, and make that state her permanent home.    Accordingly, May 1, 1895, she left Tennessee for Texas, in company with Mrs. Pettus, who was her traveling companion, taking with her the child.    She did not, when leaving Tennessee, contemplate locating at any particular place. Her father owned at the time of his death a considerable landed estate in Texas, in different counties, consisting mainly of grazing and timber lands.    It is reasonably certain that her intention was then to live with her child, and go from place to place, without a

fixed residence, and probably at places convenient to her real estate. She was at the time engaged to be married to Mr. Gholson, who subsequently became her second husband, but marriage was not contemplated by her sooner than in the fall of the same year, no date having been fixed. It is conceded that her intention to leave Tennessee, and to remove permanently to the state of Texas, was deliberate and final, and no question is made as to citizenship so far as the necessary intention is concerned. Reaching Texarkana, May 3, 1895, she expressed herself to Mrs. Pettus as pleased at then being a citizen of Texas, though there and at other places she registered at the hotels as from Tennessee. Her point of destination, as called for by her railway ticket, was San Antonio, at which place she arrived May 5, 1895; and it was her intention to go from San Antonio to Goliad with Mrs. Pettus, but there was no intention of establishing a home at Goliad, nor of remaining there except for a short while. Mr. Gholson joined her on the way. When they reached Texarkana, Mr. Gholson began to urge on Mrs. Marks the subject of an immediate marriage. She insisted that the marriage should not occur earlier than in the fall. On reaching San Antonio, he renewed the subject, and she finally consented, and they were married in the afternoon of May 5, 1895. It appears that her consent to the somewhat sudden marriage was obtained only a short time before, say one hour. As a condition on which Mrs. Marks consented to the marriage, she exacted of Gholson a promise that he would make Texas permanently his home. No reason is assigned for bringing about the marriage earlier than was contemplated, except that Mr. Gholson says, when she insisted on waiting until fall, he did not know what to expect. I think it may be inferred that Mr. Gholson was undecided as to whether he would remove to Texas, and what his other plans would be, until the question of whether the marriage would take place was a settled one.

On September 13, 1895, Albert D. Marks, a citizen of Tennessee, as trustee, filed a bill in the chancery court at Winchester, Tenn., against Mrs. Gholson, her husband, and the minor child, alleging that they were nonresidents of the state of Tennessee, and residents of the state of Texas, and making as defendant, also, Roy Fitzpatrick, a citizen of Tennessee, alleged to be the regular guardian of the infant, Albert S. The purpose of this suit was to surrender the trust, with a final account. On the same day, Albert S. Marks, the infant, by his next friend, Mr. Gholson, filed a bill in the United States circuit court at Nashville, Tenn., suing as a citizen of Texas, against Albert D. Marks and his mother, Mrs. Novella Marks, citizens of Tennessee. Both bills are substantially for the same purpose, though not entirely so. Neither in the oral arguments nor briefs is there any reference to the presence of Fitzpatrick as affecting the question of jurisdiction by removal. This point is reserved for specific inquiry, which, upon the authority of cases like Morris v. Gilmer, 129 U. S. 315, 9 Sup. Ct. 289, the court must make for itself. It is a case where the jurisdiction is concurrent in state and federal courts. The bill was filed in the chancery court, at Winchester, at 7:30 o'clock a. m., while the precise time of filing the bill in the United States

circuit court is not indicated by the clerk. The suit in the state court has been removed into the United States court on petition of the nonresidents. The petition alleges that Roy Fitzpatrick is not the regular guardian of the infant, Albert, and sets out reasons on which it is assumed that the order of appointment is void. Issue is taken on the petition for removal so far as it alleges the Texas citizenship of the child, Marks; and, by plea in abatement to the jurisdiction of the suit instituted in this court, the same issue is made as to the citizenship of the child, and the cases are now heard upon these questions of jurisdiction only. It does appear that Mrs. Marks, with the child, was in Texas on the 3d, 4th, and until the afternoon of the 5th of May, 1895, before the second marriage; and the question is, had she effected during that time a change in citizenship of herself and child?

The constitution of the United States (article 3, § 2) declares that the judicial power of the United States shall extend, among other cases, "to controversies between citizens of different states." And the various judiciary acts of congress in carrying out this provision of the constitution have conferred jurisdiction on the circuit courts, limited in the terms of the constitution to suits "between citizens of different states," further restricting the jurisdiction to "suits of a civil nature at common law or in equity," and restricting the jurisdiction also in respect to the sum or value of the matter in dispute. And as the jurisdiction of the circuit courts is limited in the sense that such courts have no jurisdiction, except that conferred by the constitution and laws of the United States, the ruling has been such from the beginning as to require that the jurisdiction should clearly and distinctly appear from the record without argument or inference, the presumption being that a case is without the jurisdiction of the circuit court unless the contrary affirmatively appears. Robertson v. Cease, 97 U. S. 646; Brown v. Keene, 8 Pet. 112; Anderson v. Watt, 138 U. S. 694, 11 Sup. Ct. 449. Persons may be citizens of the United States without being citizens of any state. Slaughterhouse Cases, 16 Wall. 36; U. S. v. Cruikshank, 92 U. S. 542. Citizenship, in relation to the federal judiciary, must be of that kind which identifies the party with some particular state of which he is a member. Butler v. Farnsworth (1821) 4 Wash. C. C. 101, Fed. Cas. No. 2,240; Morris v. Gilmer, 129 U. S. 315, 9 Sup. Ct. 289; Mitchell v. U. S., 21 Wall. 350. To constitute citizenship of a state in relation to the judiciary acts requires—First, residence within such state; and, second, an intention that such residence shall be permanent. In this sense, state citizenship means the same thing as domicile in its general acceptation. The act of residence does not alone constitute the domicile of a party, but it is the fact of residence, accompanied by an intention of remaining, which constitutes domicile. The distinction between domicile and mere residence may be shortly put as that between residence animo manendi and residence animo revertendi. Morris v. Gilmer, Mitchell v. U. S., Butler v. Farnsworth, supra; Doyle v. Clark, Fed. Cas. No. 4,053. Mere residence may be for a transient purpose, as for business, for a fixed period, or limited by an expected future event, upon the happening of which there is a pur-

pose to return or remove. The two elements of residence, and the intention that such residence shall be permanent, must concur to make citizenship. It has consequently been held from the beginning that an averment of residence is not the equivalent of an averment of citizenship for the purpose of supporting jurisdiction in the courts of the United States. Horne v. George H. Hammond Co., 155 U. S. 393, 15 Sup. Ct. 167; Wolfe v. Insurance Co., 148 U. S. 389, 13 Sup. Ct. 602; Menard v. Goggan, 121 U. S. 253, 7 Sup. Ct. 873; Everhart v. Huntsville College, 120 U. S. 223, 7 Sup. Ct. 555; Grace v. Insurance Co., 109 U. S. 278, 3 Sup. Ct. 207; Brown v. Keene, 8 Pet. 112; Turner v. Bank, 4 Dall. 8. And this ruling has been adhered to, to the present time, and has been held to be unaffected by the definition of citizenship as contained in the fourteenth amendment of the constitution of the United States, wherein it is declared that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the state wherein they reside." Shaw v. Mining Co., 145 U. S. 444, 12 Sup. Ct. 935; Anderson v. Watt, 138 U. S. 694, 11 Sup. Ct. 449. The question with which the court is dealing here is whether or not there had been, at the time of the institution of these suits, a change in the citizenship of the infant, Albert S. Marks, Jr., for the question relates to that time.

In Mitchell v. U. S., 21 Wall. 353, Mr. Justice Swayne said:

"Among the circumstances usually relied upon to establish the animus manendi are declarations of the party, the exercise of political rights, the payment of personal taxes, a house of residence, and a place of business."

It may be observed, in passing, that the facts here mentioned are treated as parts of the evidence tending to establish citizenship, but not as conditions of citizenship, or citizenship itself. Infants cannot change their own domicile. Their domicile is that of their parents. If the father be living, the domicile of an infant and that of its mother follow the domicile of the father, unless the husband and wife be separated. After death of the father. the domicile of the infant is that of the mother; and, while remaining a widow, she may, by changing her domicile, change the domicile of the infant, the domicile of the child following the domicile of the mother. The widow, however, by marrying again, acquires the domicile of the second husband, and does not thereafter possess the power to change the domicile of the infant. Lamar v. Micou, 112 U. S. 452, 5 Sup. Ct. 221; Lamar v. Micou, 114 U. S. 219, 5 Sup. Ct. 857; Rorer on Interstate Law (2d Ed.) 261. At the time of the death of Arthur H. Marks, therefore, the domicile of the infant, Albert S., was that of his father, at Winchester, in Tennessee, and the same was also the domicile of the mother; and this domicile, once existing, continues until another is acquired. Desmare v. U. S., 93 U. S. 605. And so, too, as a matter of evidence, the domicile, once acquired, is presumed to continue until it is shown to have been changed. Mitchell v. U. S., 21 Wall. 350. As the husband had his domicile in the state of Tennessee at the time of his death, the domicile of the widow remained there until it is shown to have been changed, which she had the power to do between his death and her second marriage, or while she remained a

widow. Pennsylvania v. Ravenel, 21 How. 103. If the widow be shown to have changed her own domicile or citizenship during the period between her first husband's death and her second marriage, she, by that act, effected a change in the domicile of the infant, which, as has been seen, would follow her domicile after the death of the father. The jurisdiction of this court depending on the citizenship of the infant, and this depending on that of the mother while a widow, the case as to jurisdiction turns upon the question alone whether the widow had changed her own citizenship from Tennessee to Texas before her marriage with the defendant Gholson; and the question, in its last analysis, as will be seen, depends upon the point whether or not a fixed place of abode, called a "municipal domicile," is essential to constitute the residence element in citizenship. It is not controverted, but conceded, that it was her deliberate and final intention, when she left Tennessee, to become a citizen of Texas, and to make that state permanently her home. So determined was she in this respect that she required, as has been seen, before she would consent to marry the second husband, Gholson, that he would promise to make Texas his permanent home, which he did. The requisite intention then existing and being conceded, it only remains to determine whether the other element, of residence in the state of Texas, had been sufficiently acquired to constitute citizenship. The case, then, at last, comes to the question how far, if at all, time and the mode of residence are essential to a change of citizenship. As soon as the widow reached the state of Texas, there could be no question that, as a fact, she was then in that state, and abiding there, and not in Tennessee. Was it necessary that she should remain in Texas any particular period of time, or that she should adopt any particular mode of residence, to complete a change in her citizenship? It is true, ordinarily, that a party removing from one state to another, with an intention of permanent change, acquires in the new state a fixed place of residence in some city or county, technically called a "municipal domicile," involving the idea of a fixed locality; but, in considering the question of change of citizenship between two states of the Union, our duplex political system must be taken into account, and it must be recognized that national citizenship and national allegiance are the same with citizens in each and all of the states, and the change by removal from one state to another does not require putting off an existing national allegiance, and the assumption of a new one, and is attended with no such difficulties as pertain to a similar change between two states or nations politically and entirely foreign to each other. All that is necessary to effect such change is removal from one state to another, with the intention to reside permanently in the new state.

In Cooper v. Galbraith (1819) Fed. Cas. No. 3,193, Mr. Justice Washington, presiding at the circuit, charged the jury as follows:

"The question of jurisdiction is first to be considered. It is composed of law and fact; and, as soon as the latter is ascertained, the question is relieved from every difficulty. 'Citizenship,' when spoken of in the constitution in reference to the jurisdiction of the courts of the United States, means nothing more than 'residence.' The citizens of each state are entitled to all the privileges and immunities of citizens in the several states; but, to

give jurisdiction to the courts of the United States, the suit must be between citizens residing in different states, or between a citizen and an alien. If a citizen of one state should think proper to change his domicile, and to remove himself and family, if he have one, into another state, with a bona fide intention of abandoning his former place of residence, and to become an inhabitant or resident of the state to which he removes, he becomes, immediately upon such removal accompanied with such intention, a resident citizen of the state, and may maintain any action in the circuit court of the state which he has abandoned, or in that of any other state, except the one in which he has settled himself. Time, in relation to this new residence, occupation, a sudden removal back to the state he has abandoned after instituting a suit in the circuit court of that state, and the like, are circumstances which may be relied upon to show that his first removal was not bona fide, or intended to be permanent; but they will not be sufficient to disprove his citizenship in the place of his new domicile, and to exclude him from the jurisdiction of the circuit court for the district in which he had formerly resided, if the jury are satisfied from the evidence that his first removal was bona fide, and without an intention of returning."

This case was followed in the subsequent case of Butler v. Farnsworth (1821) 4 Wash. C. C. 101, Fed. Cas. No. 2,240. The case of Cooper v. Galbraith was approved in Morris v. Gilmer, 129 U. S. 328, 9 Sup. Ct. 289. In Morris v. Gilmer the supreme court of the United States stated the rule upon this subject as follows:

"We are thus brought to the question whether the plaintiff was entitled to sue in the circuit court. Was he, at the commencement of this suit, a citizen of Tennessee? It is true, as contended by the defendant, that a citizen of the United States can instantly transfer his citizenship from one place to another (Cooper v. Galbraith, 3 Wash. C. C. 546, 554, Fed. Cas. No. 3,193); and that his right to sue in the courts of the United States is none the less because his change of domicile was induced by the purpose, whether avowed or not, of invoking, for the protection of his rights, the jurisdiction of a federal court. As said by Mr. Justice Story, in Briggs v. French, 2 Sumn. 251, 256, Fed. Cas. No. 1,871: 'If the new citizenship is really and truly acquired, his right to sue is a legitimate, constitutional, and legal consequence, not to be impeached by the motive of his removal.' Insurance Co. v. Broughton, 109 U. S. 121, 125, 3 Sup. Ct. 99; Jones v. League, 18 How. 76, 81. There must be an actual, not pretended, change of domicile. In other words, the removal must be 'a real one, animo manendi, and not merely ostensible.' Case v. Clarke, 5 Mason, 70, Fed. Cas. No. 2,490. The intention and the act must concur in order to effect such a change of domicile as constitutes a change of citizenship. In Ennis v. Smith, 14 How. 400, 423, it was said that a removal which does not contemplate an absence from a former domicile for an indefinite and uncertain time is not a change of it; 'and that, while it was difficult to lay down any rule under which every instance of residence could be brought which may make a domicile of choice,' there must be, to constitute it, actual residence in the place, with the intention that it is to be a principal and permanent residence."

So, in Burnham v. Rangeley (1845) 1 Woodb. & M. 7, Fed. Cas. No. 2,176, Mr. Justice Woodbury, considering the question of a change of citizenship, said:

"There seems, then, to be no other objection to the application of the following well-settled principles to the facts in this action: First. That, where a person removes from one place to another with the intent to make the latter his permanent abode, his domicile is to be regarded as immediately changed. The Venus, 8 Cranch, 253, 278; U. S. v. The Penelope, Fed. Cas. No. 16,024; Story, Confl. Laws, § 46; The Ann Green, Fed. Cas. No. 414; 3 C. Rob. Adm. 12; 5 C. Rob. Adm. 60, 233. Justice Story said in The Ann Green, supra: 'Even the shortest residence, if with a design of a permanent settlement, stamps the party with a national character.' That was a new residence after a removal. Second. Such a change at once affected the juris-

diction of the United States courts. Case v. Clarke, Fed. Cas. No. 2,490; Gassies v. Ballon, 6 Pet. 761; Cooper v. Galbraith, Fed. Cas. No. 3,193; Catlett v. Insurance Co., Id. 2,517. The person altering his domicile to another place is a citizen, within the meaning of the act of congress as to suing or being sued in this court, whether he is yet allowed to vote or to hold office or not in the state of his new domicile. Catlett v. Insurance Co., supra. It follows, then, that as, for the purpose of jurisdiction in this court, a permanent residence generally constitutes citizenship, and controls our proceedings, and as, before the filing of the bill in this case, we are satisfied that the respondent had removed to Virginia with a view to make it his permanent abode, he was not at that time a citizen of Maine."

In the notes to this case, as published in the reprint (Fed. Cas. No. 2,176), will be found a very full collection of cases upon the subject.

In Kemna v. Brockhaus, 5 Fed. 762, suit was brought in the Eastern district of Wisconsin, the complainant alleging that the plaintiff was a citizen of Minnesota. This was denied in the plea to jurisdiction, which averred that she was, and always had been, a citizen of the state of Wisconsin. It appeared in evidence that plaintiff and her husband, with one child and a nurse, left Milwaukee August 5, 1880, and went to Minnesota. Suit was begun September 17, 1880. The plaintiff testified that it had been arranged to go to Glencoe, Minn., where her husband expected to engage in business. They first went to St. Paul, however, she stopping there, and he going to Glencoe. The Glencoe business was given up, and he returned to St. Paul, renting rooms, and keeping house. His situation was then that of one seeking employment, with no place fixed upon, and continued to be such until the suit was instituted, and afterwards. In December following, they returned to Milwaukee; the plaintiff testifying that they had returned to Milwaukee merely to await the trial of the suit, and with the intention of returning to St. Paul when the suit should be disposed of. It was held that her citizenship had been changed to the state of Minnesota. And in harmony with this ruling are the cases of Blair v. Female Seminary, 1 Bond, 578, Fed. Cas. No. 1,486; The Venus, 8 Cranch, 253; Read v. Bertrand, Fed. Cas. No. 11,602; Doyle v. Clark, Fed. Cas. No. 4,053.

In the case last cited (Doyle v. Clark), Mr. Justice Brown, then district judge, thus stated the law in relation to a change of domicile:

"Two things must concur to effectuate a change of domicile: (1) An actual change or removal of residence. (2) An intention to make such change or removal permanent. If both of these requisites concur in point of time, the place to which removal is made becomes instantly the place of domicile, notwithstanding the party may entertain a floating intention of returning at some future period. Story, Confl. Laws, § 46. This is illustrated in the ordinary case of an emigrant who transports his family and household effects to a new state, and settles upon a farm. A change of domicile takes place immediately upon his arrival. On the other hand, a person may transport his family and household effects in like manner to another state for a temporary purpose (as, for instance, the settlement of some particular business, or for a change of climate in summer) without thereby disturbing his former residence. The leading English case on this question is that of Somerville v. Somerville, 5 Ves. 750; and the principles there laid down have been since so often reaffirmed as to have become the unquestioned law of both coun-

tries. From a very large number of American cases, I cite the following as the best illustrations of the general doctrine: State v. Hallett, 8 Ala. 159; Ringgold v. Barley, 5 Md. 186; Smith v. Croom, 7 Fla. 81; McKowen v. McGuire, 15 La. Ann. 637; Leach v. Pillsbury, 15 N. H. 137; Johnson v. Twenty-One Bales, Fed. Cas. No. 7,417; Jennison v. Hapgood, 10 Pick. 98; Williams v. Whiting, 11 Mass. 424."

As will appear from the statement of the facts, Texas was the domicile of origin or nativity of the mother of the infant, Albert, and her domicile in Tennessee was one of choice. This fact is brought out because it is agreed by all of the authorities that the domicile of nativity or origin is more easily reacquired, or reverts more readily than a domicile of choice may be acquired, or, to say the least of it, less evidence is required to establish such change, particularly as respects time and a fixed locality or municipal domicile, which facts, indeed, have no bearing except as evidence in any case.

In *Story on the Conflict of Laws* the following propositions are laid down as established:

"Fourteenthly. The mere intention to acquire a new domicile, without the fact of an actual removal, avails nothing; neither does the fact of removal without the intention. * * * Seventeenthly. If a man has acquired a new domicile, different from that of his birth, and he removes from it with an intention to resume his native domicile, the latter is reacquired, even while he is on his way, in itinere, for it reverts from the moment the other is given up. The foregoing rules mostly relate to changes of domicile from one place to another within the same country, or territorial sovereignty, although many of them are applicable to residence in different countries or sovereignties. * * * Thirdly. A national character, acquired in a foreign country by residence, changes when the party has left the country animo non revertendi, and is on his return to the country where he had his antecedent domicile. And especially, if he be in itinere to his native country with that intent, his native domicile revives while he is yet in transitu; for the native domicile easily reverts. The moment a foreign domicile is abandoned, the native domicile is reacquired." Sections 47, 48.

I see no reason why the doctrine as thus stated is not applicable to a change from one state to another in our system. A careful study of the cases, both English and American, upon this subject, discloses that the time of residence is nowhere laid down as a condition of citizenship, or as being essential to the acquisition of a new domicile, or the reacquisition of the domicile of origin, and certainly this is true in respect to the latter. No case has been found which suggests any particular time as constituting the element of residence in a change of domicile, and it seems to me that the subject in its nature is incapable of any rule as to time. And counsel concedes that time is not essential, and rests the case upon the contention for a local fixed domicile. It is not believed that any case can be found holding that a "house of residence," or a fixed residence within the state, is essential to establish domicile. Considering the intimate relation between the states in our system and the freedom of interstate commerce and the habits of our people, I do not think any particular mode of residence is requisite. The necessary animus existing, it is sufficient that a party actually abides in a state, intending it as his or her permanent home. In the case of unmarried men and women, having left the home of their

parents, a rule requiring a fixed local residence would often prevent the acquisition of state citizenship at all. Taking the case of the widow of Marks returning to Texas, it would be improbable that she would take up a fixed residence there with only herself and her infant child. On the contrary, it would be more reasonable to expect that she would live at hotels or boarding houses, and that she would change from place to place, as attention to her landed estate might require, or her pleasure and different seasons of the year might suggest. It is to be observed that, so far as the circumstances of time and a fixed place of abode enter into the discussion of the cases, these circumstances are treated as parts of the evidence bearing on the intention, and as evidence only, and not as supporting the proposition that time or a fixed domicile are necessary to constitute the residence element in citizenship. It will avoid confusion if this be kept in mind.

"The whole question of domicile," said Mr. Justice Woodbury in Burnham v. Rangeley, "is usually dependent on the intent of the party, though that is to be collected or inferred from acts as well as declarations. The acts are chiefly important as showing the intent."

And, in the Law of Domicile by Jacobs, the result of the decided cases is thus stated:

"It is probably not necessary that, in order to work a change of domicile from one state or country to another, the person whose domicile is in question should reach the particular spot within the territorial limits of the latter at which he intends fixing his permanent abode; and indeed it may perhaps be said that it is not absolutely necessary for such purpose that the person should ever have, either in fact or in contemplation, a permanent home within any particular municipal division of such state or country. Such cases must necessarily be rare, but it is possible to conceive of a Frenchman, for example, coming to England with the intention of permanently remaining there, but without ever fixing a permanent abode in any particular part of that country. In such case, while it would doubtless be much more difficult to prove the requisite intention than if he had, for example, purchased a dwelling house, and fixed himself in it in an apparently permanent manner, yet, assuming the requisite intention to be made out by other proofs, there is little doubt that his domicile would be held to be changed. Lord Jeffrey, in Arnott v. Groom, thus remarks upon this subject: 'I cannot admit what Lord Fullerton assumes to be the rule,—that, in order to make a domicile, it is necessary to have some particular spot within the territory of a law; that it is not enough that the party should have an apparently continual residence there, but shall actually have a particular spot, or remain fixed in some permanent establishment. In considering the indiciæ of domicile, these things are important, but they are not necessary, as matters of general law, to constitute domicile. Many old bachelors never have a house they can call their own. They go from hotel to hotel, and from watering place to watering place, careless of the comfort of more permanent residence, and unwilling to submit to the gene attendant on it. There was the case of a nobleman who always lived at inns, and would have no servants but waiters; but he did not lose his domicile on that account. If the purpose of remaining in the territory be clearly proved aliter, a particular home is not necessary.' Dicey also maintains the same view. * * * When the transfer of bodily presence has been accomplished, the factum is complete; and, generally speaking, no further act is necessary, but domicile invests immediately, provided the requisite animus be present." Sections 133 and 134.

So, too, in his recent work on the Conflict of Laws, Mr. Dicey, after distinguishing between the terms "domicile" and "home," and quot-

ing with approval the language of the eminent Scotch judge in Arnott v. Groom, comments upon the subject as follows:

"Take, for example, Story's definition of the term 'domicile,' viz.: 'That place in which a person's habitation is fixed without any present intention of removing therefrom,' and apply it to the following case: D. is a Frenchman, settled for years in England, but living in lodgings in Manchester. His full intention is to live permanently in England, but he has no intention of residing more than a limited time in Manchester. His intention may be to spend his life successively in different parts of England, or his purpose may be to go after six months to London, and occupy a house there (which he has already bought) for the rest of his life. Under these circumstances, there is no one place in England which is his home or domicile. Manchester is not his home, because, though he resides there, he has not, and never had, as regards Manchester, any intention of permanent residence. No other place in England is his home, because, though he may intend to reside in London, he has not begun to reside there in fact. The solution of the difficulty, which might in fact arise with reference, e. g. to the disposition of D.'s property, if he were to die before leaving Manchester, is that, though not domiciled at any one place in England, he has an English domicile, since, with regard to England, there exists on D.'s part both residence and the animus manendi." Dicey, Confl. Laws, p. 93.

See, also, American Note, pp. 161, 166–170, and cases referred to, sections 24, 25. See, also, Anderson v. Watt, 138 U. S. 694, 11 Sup. Ct. 449. Also the leading case of Udny v. Udny (1869) L. R. 1 H. L. Sc. 441, 457.

The learned counsel, supporting the objection to jurisdiction in the case, refers to the following clause in the judiciary act:

"And no civil suit shall be brought before either of said courts against any person by any original process or proceeding in any other district than that whereof he is an inhabitant, but where the jurisdiction is founded only on the fact that the action is between citizens of different states, suit shall be brought only in the district of the residence of either the plaintiff or the defendant."

It is argued that, under this provision in the act, a citizen of another state going to Texas could not have brought suit against Mrs. Marks, because she was not a resident of any particular district, the state of Texas being divided into three judicial districts. Nor, it is said, could Mrs. Marks have instituted a suit in either of those districts, as being the place of her residence, against a citizen of another state, provided valid service of process could have been had upon such citizen of another state. And it is argued with much confidence and force that this proves that the test of citizenship for the purpose of jurisdiction is a fixed residence. This argument I do not think requires any extended examination. The obvious vice in the argument is that it assumes the very point in dispute, and then proceeds to the conclusion. Counsel, having argued that a local domicile is necessary to constitute the residence element in citizenship, now takes that point for granted, and contends that Mrs. Marks could not acquire a residence in any district of Texas, within the meaning of the clause in question, for want of such local domicile. It is not insisted that the term "residence" is used in this clause of the judiciary act in any different meaning from its use as an element constituting citizenship, and, if it has been shown (as I think it has) that a local domicile is not necessary to estab-

lish residence in the acquisition of citizenship, it seems sufficiently clear that it is not necessary to constitute residence within a district. If (as the fact is) Mrs. Marks removed to Texas contemplating a mode of life which did not permit of acquiring a fixed domicile, her legal or constructive residence would be in any district in which she might for the time being abide, according to her adopted mode of living. If her time should be divided in this mode between different districts of the state, she would be a resident 'or inhabitant of any district in which she might in fact be, for the purpose of jurisdiction; for if it does not require a fixed abode to make her a citizen of Texas, while residence in a district as determining the place of suit does, the curious result would be that as a citizen of Texas she might go to any other state in the Union, and sue in the circuit courts of the United States, while she could not resort to those courts in her own state, other jurisdictional conditions being present. But (and what is more decisive) the provision of the act as to the particular district in which the action shall be brought does not touch the general jurisdiction of the court over such cause, but affects only the proceedings taken to bring the defendant within the jurisdiction, and is a matter of personal privilege, which may be waived, and is waived unless the objection is seasonably taken. Improvement Co. v. Gibney, 160 U. S. 217, 16 Sup. Ct. 272; Trust Co. v. McGeorge, 151 U. S. 132, 14 Sup. Ct. 286. Had Mrs. Marks remained in Texas for a period of 12 months or more, unmarried, and residing there at different places, as contemplated when she left Tennessee, it would hardly be contended that she was not then a citizen of Texas. The conditions, however, would be exactly the same as at the beginning of her residence in Texas, the difference in time only excepted, and this difference in the length of time would be wholly unimportant (as admitted) save as evidence showing more satisfactorily the necessary intention,—a fact not here disputed. All generally stated doctrines of law admit of such construction as makes them reasonable when applied to the facts of a particular case; and so it is often said that every case must to an extent depend upon its own facts. Accepting the result of the adjudged cases, I am of the opinion that, when the widow Marks reached the state of Texas, the factum and animus co-existed; and that she instantly became a citizen of Texas, and the domicile of the infant, following hers, was changed by the same act which changed hers; and that jurisdiction of these cases is supported by necessary diverse citizenship. It must be observed that judicial citizenship only is here discussed.

The motion to remand and the plea being overruled leaves both cases pending in this court between the parties really interested, the object of the two suits being substantially the same. The same relief sought may be had in either case by proper pleading. If the suit instituted in the state court had remained there, its pendency therein would not have constituted a sufficient defense to the suit for the same purpose in this court. Insurance Co. v. Brune's Assignee, 96 U. S. 588; Gordon v. Gilfoil, 99 U. S. 168; Stanton v. Embrey, 93 U. S. 548; Ahlhauser v. Butler, 50 Fed. 709. Decisions to

the contrary on the circuit may be found, and the sufficiency of such a plea was apparently assumed, without being decided, in Watson v. Jones, 13 Wall. 679. While the pendency of the suit in the state court is not a good plea, the same result is practically accomplished in cases of concurrent jurisdiction by the rule of comity stated in Watson v. Jones, and again enunciated in cases like Railroad Co. v. Gomila, 132 U. S. 478, 10 Sup. Ct. 155, and Shields v. Coleman, 157 U. S. 168, 15 Sup. Ct. 570, particularly where embarrassment would arise. The court first acquiring jurisdiction is allowed, by such comity, to proceed in an orderly way until the suit is finally disposed of, especially where the state court has appointed a receiver, as in this case. But the removal act provides that, when the suit is removed into this court, "the cause shall then proceed in the same manner as if it had been originally commenced in the said circuit court." 24 Stat. 554. The court cannot allow two suits having the same object, and between the same parties really interested, to be carried on at the same time in such court. Upon the record before me, I think that jurisdiction first attached in the state court. It may be that the defendants, by appearing and making application for a removal of the cause into this court, have conceded this point. While the second bill seeks relief to a slight extent which might not be had under the first bill, there is no such difference as to justify two independent suits. The plaintiff in the suit originally instituted in this court may dismiss the same, with liberty to file a cross bill in the first suit, if so advised, unless, by consent, the present bill shall be treated as a cross bill in that cause; otherwise, counsel for the plaintiff in the first suit may file a plea to the original suit herein, setting up the pendency of the former suit, which plea will constitute a good defense, as both are cases in equity. Watson v. Jones, 13 Wall. 679; The Haytian Republic, 154 U. S. 124, 14 Sup. Ct. 992; 2 Daniell, Ch. Prac. (6th Ed.) 633; Story, Eq. Pl. (10th Ed.) § 743.