## DESMARE *v.* UNITED STATES.

1. A domicile once existing continues until another is acquired ; and, where a change thereof is alleged, the burden of proof rests upon the party making the allegation.
2. A., whose domicile was, and continued during the war to be, at New Orleans, went into or remained within the territory embraced by the rebel lines, engaged actively in the service of the rebel government; and, while so engaged, purchased certain cotton, which, upon the subsequent occupation of that territory by the military forces of the United States, was seized, sold, and the proceeds paid into the treasury. · *Held,* that his purchase of the cotton was illegal and void, and gave him no title thereto.
3. *Mitchell* v. *United States,* 21 Wall. 350, reaffirmed, and applied to this case.  ·

APPEAL from the Court of Claims.

On the 26th of June, 1867, Alphonse Desmare, of New Orleans, La., filed his petition in the Court of Claims to recover the value of five hundred and fifty-six bales of cotton, alleging that, in the year 1863, he was the owner of that number of bales, then at Opelousas, in the parish of St. Landry, La.; that, in April, 1863, said cotton was taken and captured by officers of the United States army, by whom, under the orders of General N. P. Banks, commanding the Department of the Gulf, it was shipped to New Orleans, sold, and the proceeds placed in the treasury of the United States.

The court below found, as matters of fact, —

1. The claimant, before the war, had his domicile in the city of New Orleans, La., where he resided, and was a partner with one Laforest, under the style of Laforest & Desmare, commission-merchants, and he was residing there also on the 19th of January, 1866.    There is no evidence of any change of said domicile, or of a dissolution of said partnership; nor is there any evidence as to where the claimant was on the 27th of April, 1862, when the United States military forces took possession of New Orleans, or before that date, during the war, or

afterward, until October, 1862, when it is proved he was in the parish of St. Landry, La., purchasing the cotton, which is the subject of this action, and acting as agent of the rebel government for the exchange of Confederate bonds for Confederate notes, for which latter purpose he had an office at Opelousas, in said parish. Said parish was within the rebel lines until April, 1863, when it was taken possession of by United States forces under General Banks.

2. Between the 1st of October, 1862, and the month of April, 1863, the claimant, in person, purchased within said parish, of different persons, two hundred and sixty-eight bales of cotton, and paid for the same in Confederate money. All of said cotton was seized by officers of the United States upon the entry of their military forces into said parish, was turned over to agents of the Treasury Department, sold, and the net proceeds, to the aggregate amount of $51,456, are now in the United States treasury.

3. Said claimant and one Dupré, jointly and personally, purchased within said parish, March 3, 1863, eighty-four bales of cotton, for which they gave their notes, with security. These notes were paid after the war, one-half by the claimant and one-half by said Dupré. This cotton was seized by officers of the United States in April, 1863; was turned over to treasury agent and sold, and the net proceeds thereof, to the amount of $16,128, are in the United States treasury.

4. The claimant has failed to prove that any other cotton owned by him was seized by officers or agents of the defendants.

The court thereupon concluded, as matters of law, —

1. The claimant's domicile, found to have been in the city of New Orleans before the war, and not proved to have been changed, is presumed to have continued and been in that city when the purchases of cotton were made by him within the rebel lines, as set forth in the findings.

2. The claimant's domicile being in the city of New Orleans, he is presumed to have been there personally until he is proved to be elsewhere; and the claimant, not showing that he was absent from the place of his domicile when the city was captured, April 27, 1862, it is presumed he was there at that time,

and subsequently crossed the Federal lines about the time he is proved to be in the parish of St. Landry.

3. The purchases of cotton by the claimant, under the circumstances set forth in the findings, were void as against the law and public policy of the United States, and he acquired no title to the cotton thereby.

The plaintiff's petition having been dismissed, he appealed to this court.

*Mr. Thomas J. Durant* and *Mr. C. W. Hornor,* for the appellant.

Because the claimant's domicile was in the city of New Orleans before the war, and was not shown by proof to have been changed, the presumption of the court below, that his domicile continued and was " in that city when the purchases of cotton were made by him within the rebel lines," &c., is contrary to both the facts and the law. He had his domicile in the parish of St. Landry when he bought the cotton there. It being established that before the war he was a rebel, and still one on Jan. 19, 1866, it is a presumption of law, that during all the intermediate time he remained one.

*Probatis extremis præsumuntur media.* Domicile is a question both of law and fact. Claimant was, in October, 1862, in the parish of St. Landry, "purchasing cotton, and acting as agent of the rebel government." As such an officer, it is undeniable he could have no domicile within the Union lines. The voluntary residence of the petitioner in New Orleans after the war began would have been a crime, and statute evidence of it.

The moment he took the oath and assumed the duties of an agent of the Confederate government in St. Landry, his domicile, both political and civil, in that parish, became fixed *eo instanti.*

This is a *presumptio juris et de jure.* It is as conclusive as the bar of a statute of limitation, or the estoppel by an adjudication of a matter in a court of competent jurisdiction. No court will allow the contrary proof to be made. In the case of a public officer, neither the fact nor the intent of a domicile elsewhere could prevail over this presumption, which differs radically from the presumptions of the court below. 1 Evans's

Pothier, 414 ; La. Code, 1870, art. 45 ; Phillimore on Domicile, 61 ; *Murray* v. *Charming Betsy*, 2 Cranch, 64 ; *The Venus*, 8 id. 280 *et seq.; The Frances*, id. 363 ; Merlin, Rep., *verbo* Domicile; Boileux Commentaries Code Nap., vol. i. p. 220, on Code Nap. art. 107.

It cannot be doubted that there are transactions so radically and fundamentally national as to impress the national character, independent of peace or war, and the local residence of the parties. *The Vrow Anna Catharina*, 5 Rob. A. 167.

The petitioner was involved in the universal disloyalty of the South from the beginning of the war up to 19th January, 1866, and had his domicile, political and civil, in rebel territory during all that time, except for the interval between April 27 and October, 1862. In the absence of any proof of the fact that he was domiciled in New Orleans during this period, the lower court presumes, because he was there domiciled before the war ; and, because this domicile was not proved to have been changed, it must be presumed to have continued ; and hence he was domiciled in New Orleans when the purchases were made by him within the rebel lines.

Such a presumption is certainly not applicable to the exceptional state of war. In a prize court, it cannot be doubted that in an investigation into the legality or illegality of a trade carried on in an alleged violation of the laws of war, and where the proceedings were *in rem* against cotton, as in this case, Desmare's domicile would not be found to be under the flag of the Union. Politically, he would be decreed a Confederate by the courts of the Confederate States ; and the idea that the Confederacy could have confiscated this cotton before its capture by the United States forces, on the ground that he was presumably a loyal man, because he had crossed the lines from New Orleans, and had renewed his allegiance to the Union, is purely illusory. And yet this result flows as naturally from the facts found as the legal conclusions drawn by the court below ; and both are contradictory and untrue.

The question is, what is the political, rather than what is the civil, domicile of the claimant when residing in St Landry parish. The simple test, did he abandon the Union and cast his lot with the rebels, if applied in this case, would be quite con-

clusive. His acts and doings manifest a clear intent in him *quatenus in illo exuere patrium.* *Whicker* v. *Hume,* 7 H. L. C. 159; *Moorhouse* v. *Lord,* 10 id. 282; *Holdane* v. *Eckford,* L. R. 8 Eq. 631; Woolsey's Intern. Law, § 168.

For the purpose of capture, property found in enemy territory is enemy property, without regard to the *status* of the owner. In war, all residents of enemy country are enemies. The time is not so essential as the intent. *Lamar, Executor,* v. *Brown et al.,* 92 U. S. 187; *Scholefield* v. *Eichelberger,* 7 Pet. 593; *Johnson* v. *Merchandise,* 6 Hall's Am. L. I. 68; *United States* v. *Penelope,* 2 Pet. Adm. 438.

The Court of Claims first presumes, that New Orleans being Desmare's domicile prior to his capture, he remained so domiciled afterwards; and from this presumption draws a consequent presumption, that he must have crossed the line to buy the cotton. But no presumption can be safely drawn from a presumption. *Douglass* v. *Mitchell's Executor,* 35 Penn. 440.

War made all the inhabitants of Louisiana enemies of the Union. To this rule there were no exceptions in law, and few in fact. As fast as the territory was reconquered, its inhabitants did not legally become loyal, and vested with the capacity to stand in judgment in the Court of Claims, or any other national court. Until pardoned, and their allegiance was renewed, they were enemies. The essential elements of illegal traffic in time of war are: 1st, That it takes place between members of the two nations respectively in hostility to each other; 2d, That it counteracts the operations of war. 1 Kent, 66. Both of these elements must concur. *Griswold* v. *Waddington,* 15 Johns. 57; *United States* v. *Grossmayer,* 9 Wall. 72; *Montgomery* v. *United States,* 15 id. 395; *Coppell* v. *Hall,* 7 id. 542; *United States* v. *Lapène,* 17 id. 601; *Mitchell* v. *United States,* 21 id. 350.

Neither of these elements is involved in this case.

*Mr. Solicitor-General Phillips, contra.*

MR. JUSTICE SWAYNE delivered the opinion of the court.

The judgment of this court in *Mitchell* v. *United States,* 21 Wall. 350, is decisive of this case. It is unnecessary to repeat what was there said. The subject of domicile in some of its

aspects was carefully considered. We shall avail ourselves of its rulings without again specially referring to it. The findings of the Court of Claims furnish the facts we are to consider, and we cannot look beyond them. For the purposes of this case they import absolute verity and conclude both parties.

Before the breaking out of the late civil war, the appellant was domiciled in the city of New Orleans. He was a member of a commercial partnership there. There is no proof of any change of domicile subsequently. A domicile once existing continues until another is acquired. A person cannot be without a legal domicile somewhere. Where a change of domicile is alleged, the burden of proof rests upon the party making the allegation.

The cotton covered by the claim in the present case was all purchased by the appellant in the parish of St. Landry, in the State of Louisiana, between the 1st of October, 1862, and the 1st of April, 1863. That territory was then within the rebel lines. The appellant was there acting as the agent of the rebel government in exchanging its bonds for Confederate notes. His office, as such agent, was at Opelousas, in that parish.

On the 6th of April, 1862, Admiral Farragut reached New Orleans with his fleet. On the following day he demanded of the mayor the surrender of the city. No resistance was offered. On the 1st of May transports conveying the troops of General Butler arrived. On the following day their landing was completed. The military occupation of the city by the United States then began, and it continued without interruption down to the close of the war. On the 6th of May the commanding general issued a proclamation (prepared and dated on the 1st), whereby it was declared that "all rights of property of whatever kind will be held inviolate, subject only to the laws of the United States." The non-intercourse act of July 13, 1861 (12 Stat. 257), and the President's proclamations of the 16th of August, 1861 (12 Stat. 1262), of the 12th of May, 1862 (12 Stat. 1262), and of the 2d of April, 1863 (13 Stat. 731), need not be particularly adverted to. They have been so often considered by this court in previous cases, that the public and the profession are familiar with them. The parish of St. Landry

was also subjugated by the arms of the United States in April, 1863.   The cotton in question was thereupon seized, and subsequently sold, and the proceeds paid into the treasury of the United States, where they remain.   Those proceeds are the subject of this litigation.

Upon the issuing of General Butler's proclamation, the legal *status* of New Orleans and its inhabitants, with respect to the United States, became changed.   Before that time the former was enemies' territory and the latter were enemies, in all respects as if the pending strife had been a public war between the United States and a foreign belligerent, and the city had been a part of the country of the enemy, although the conflict was, in fact, only a domestic insurrection of large proportions. The city was blockaded; and the property of its inhabitants, wherever found at sea, was seized, condemned, and confiscated as prize of war.   General Butler's proclamation was proof of the subjugation of the city and the re-establishment of the national authority.   The hostile character of the territory thereupon ceased, and the process of rehabilitation began.   The inhabitants were at once permitted to resume, under the regulations prescribed, their wonted commerce with other places, as if the State had not belonged to the rebel organization.   *The Venice,* 2 Wall. 258.   But they were clothed with new duties as well as new rights.   It was a corollary from the new condition of things, that they should obey the inhibition of trade with the localities still under the ban of the President's proclamation of the 16th of August, 1861.   In this respect they were on the same footing with the inhabitants of the loyal States, abiding in such States, and with the citizens of such States, and foreigners then sojourning in New Orleans.   It was not a penal infliction, but was intended for the benefit of the nation in the prosecution of the war.   It was a burden incident to the effort the government was making to put down the insurrection.   It was the plain duty of the appellant to obey the injunction. Instead of doing so, while his domicile, in the view of the law, was and continued to be at New Orleans, he went or remained within the rebel lines, engaged actively in the service of the rebel government, and was so engaged when and where, as he alleges, he acquired the ownership of the cotton in question.

His contracts for the cotton were clearly illegal and void, and gave him no title. Such has been the ruling of this court in an unbroken series of adjudications. *Coppel* v. *Hall*, 7 Wall. 548; *United States* v. *Lane*, 8 id. 185; *United States* v. *Grossmeyer*, 9 id. 72; *United States* v. *Montgomery*, 15 id. 395; *United States* v. *Lapine*, 17 id. 602; *Mitchell* v. *United States*, 21 id. 350.

The result is the same as if the purchases had been made by an agent of the appellant, sent by him from New Orleans, instead of having been made by himself in person.

To hold otherwise would give a premium to a law-breaker, and involve the anomaly of conceding to the offender rights and immunities denied to all the citizens of the loyal States.

*Judgment affirmed.*