Charles UNANUE, also known as Ulpiano Unanue, Plaintiff,

v.

CARIBBEAN CANNERIES, INC., et al., Defendants.

Civ. A. No. 3852.

United States District Court, D. Delaware.

Feb. 24, 1971.

Henry M. Canby and Richard F. Balotti, of Richards, Layton & Finger, Wilmington, Del., and Lawrence S. Timen, New York City, of counsel, for plaintiff.

David A. Drexler and William O. LaMotte, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendants.

## OPINION

LATCHUM, District Judge.

This action was instituted on January 29, 1970 in the Court of Chancery of the State of Delaware in and for New Castle County. Thereafter, on February 27, 1970 the action was removed to this Court by the defendants. The removal petition alleged that the plaintiff, Charles Unanue ("Charles") was a "resident" of New York, that defendant, Caribbean Canneries, Inc. ("Caribbean") was a Delaware corporation, that defendants Joseph Unanue ("Joseph") and Anthony Unanue ("Anthony") were "residents" of New Jersey and that defendant Frank Unanue ("Frank") was a "resident" of Puerto Rico. The petition further alleged that, notwithstanding the fact that Caribbean was incorporated in Delaware, the state in which this action was originally brought, the defendants were entitled to remove on the basis of diversity of citizenship [1] either because Caribbean should be realigned as a party plaintiff, or alternatively, because the case involves separate and independent controversies, all of which were not between Charles and Caribbean.

On March 10, 1970, Charles moved to remand the case to the state court on several grounds, one of which was that the petition was defective in that it failed to allege the "citizenship" of the parties. Defendants moved on March 20, 1970 to amend the original removal petition to allege (a) that Caribbean's principal place of business was Puerto Rico, (b) that Charles was a citizen of New York, (c) that Frank was a citizen of Puerto Rico and (d) that Joseph and Anthony were citizens of New Jersey. Although no order was ever entered allowing the amendment, the Court concludes that the amendment should be permitted since there has been no showing of equitable considerations for denying the application. Handy v. Uniroyal, Inc., 298 F.Supp. 301, 302–305 (D.Del. 1969).

After the defendants moved to amend the removal petition, Charles filed an affidavit on April 6, 1970 in which he categorically denied that he was a New York citizen and averred that he was a domiciliary and citizen of Puerto Rico when this suit was filed and when it was removed to this Court.

Upon consideration of this Court's removal jurisdiction applicable to this case, the Court is of the opinion that the action must be remanded to the Delaware Court of Chancery. Two reasons exist for this conclusion.

First, putting aside the factual dispute of whether Charles' citizenship is New York or Puerto Rico, and accepting the defendants' contention that Charles is a New York citizen, the Court is convinced nevertheless that the case was improvidently removed to this Court.

28 U.S.C. § 1441(b) [2] provides that a diversity action may not be removed to a federal court when one or more of the defendants is a citizen of the state in which suit is brought. The petition acknowledges that defendant

[1] "Federal question" jurisdiction is not involved in this case. The sole possible basis for jurisdiction in this Court on removal is diversity of citizenship. 28 U.S.C. § 1441. The amount in controversy is in excess of $10,000.

[2] The second sentence of § 1441(b) reads: "Any other such action [including a diversity suit] shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."

Caribbean is a Delaware corporation and that suit was instituted in the Delaware Court of Chancery. This alone is sufficient to prevent removal.

■ The defendants, however, in attempting to evade this statutory restriction on the Court's removal jurisdiction, first suggest that Caribbean should be realigned as a party plaintiff since it is a mere nominal and disinterested party. The Court disagrees. Caribbean's real interest in this litigation makes it a necessary party defendant, preventing its being realigned as a nominal party plaintiff. In this action, the plaintiff seeks relief from Caribbean by demanding that his stock interest in the company be properly registered in his name. Where a plaintiff seeks relief from a corporation, the corporation is a necessary party. 3A Moore, Fed.Practice, ¶ 19.03[1] (2d Ed.1967).

■ Furthermore the complaint in this suit charges that Caribbean has conspired with the individual defendants to deprive the plaintiff of his stock in Caribbean. In a conspiracy action involving corporate matters, the corporation is not aligned with the complainant. Smallen v. Louisville Fire and Marine Ins. Co., 80 F.Supp. 279, 280–281 (W.D. Ky.1948). Moreover, even in a diversity suit, where the management of a corporation opposes litigation the corporation is deemed to be antagonistic to the plaintiff and therefore cannot be realigned as a party plaintiff. Doctor v. Harrington, 196 U.S. 579, 587–588, 49 L. Ed. 606 (1905); Koster v. (American) Lumbermens Mutual Casualty Co., 330 U.S. 518, 523, 67 S.Ct. 828, 91 L.Ed. 1067 (1947).

■ The issue of Caribbean's antagonism to the plaintiff is governed by the pleadings and the nature of the controversy. Smith v. Sperling, 354 U.S. 91, 96, 77 S.Ct. 1119, 1 L.Ed.2d 1205 (1957). The complaint shows that the plaintiff's controversy is with both Caribbean and the individual defendants who control the corporation. Where a plaintiff's controversy is with both a corporation and individual defendants, even when the corporation may benefit if the plaintiff prevails, the corporation is not realigned as a party plaintiff. Venner v. Great Northern Ry., 209 U.S. 24, 32, 28 S.Ct. 328, 52 L.Ed. 666 (1908). All the defendants are rightfully and necessarily made defendants, so none can, for jurisdictional purposes, be regarded otherwise than as defendants. Wichman v. R. H. Miller Texas Corp., 84 F.Supp. 123, 125 (S.D.Tex.1948), aff'd 174 F.2d 126 (C.A. 5, 1949). The case was improvidently removed under § 1441(b) since Caribbean, one of the defendants, is a citizen of Delaware, the state in which the action was brought.

■ In a second effort to support removal the defendants rely upon 28 U.S. C. § 1441(c).[3] That section provides for removal of certain cases when complete diversity between plaintiffs and defendants is not present. The key determination under § 1441(c) is whether "a separate and independent claim or cause of action" exists. "In making this determination [the Court] look[s] to the plaintiff's pleading, which controls." American Fire & Casualty Co. v. Finn, 341 U.S. 6, 14, 71 S.Ct. 534, 540, 95 L. Ed. 702 (1951).

The present complaint expressly alleges a single underlying wrong by all of the defendants, including Caribbean, a family owned corporation. Paragraph 17 states that "the defendants have entered into a conspiracy to appropriate to Frank and Anthony [two of the individual defendants] plaintiff's ownership of one-fourth (¼th) of the total shares of Caribbean." Paragraph 18 of the complaint details some of the acts committed by the defendants in furtherance of the

3. 28 U.S.C. § 1441(c) reads: "Whenever a separate and independent claim or cause of action, which would be removable if sued upon alone, is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters not otherwise within its original jurisdiction."

conspiracy: "A. Claimed that Frank and Anthony alone are the owners, each of 50% of all the shares of Caribbean; B. Refused to transfer Charles' shares of said stock to Charles' name despite a demand for such transfer * * *; C. Denied that Charles is the true and lawful owner of one-fourth of the shares of stock of Caribbean * * *; D. Retained and converted Charles' shares of said stock; E. Caused Charles to be removed as an officer and director of Caribbean; F. Refused to permit Charles to inspect the books of account, corporate minute books, stock ledger and stock transfer books of Caribbean."

Further, Caribbean is also named in paragraph 21 of the complaint which alleges: "The defendants, including the participating corporate defendant [Caribbean] are accountable as constructive trustees or trustees *ex maleficio* in respect to Charles' one-fourth (¼th) ownership of the total shares of Caribbean." In every respect, Caribbean is alleged to be an active participant in the underlying conspiracy.

Under *Finn*, the allegations of paragraphs 17, 18 and 21 of the complaint govern the determination of the question whether there are separate claims or causes of action under § 1441(c) and answer it in the negative. The thrust of the complaint is that the defendants, including Caribbean, have conspired and are continuing to conspire to wrongfully deprive the plaintiff of his ownership in one-fourth of the stock of Caribbean.

Even though there are several facts or transactions involved, this does not mean that for jurisdictional purposes there are separate and independent causes of action. "[W]here there is a single *wrong to plaintiff, for which relief is* sought, arising from an interlocked series of transactions, there is no separate and independent claim or cause of action under § 1441(c)." American Fire & Casualty Co. v. Finn, supra, 341 U.S. at 14, 71 S.Ct. at 540; Jury-Rowe Co. of Lansing, Mich. v. Teamsters & Chauf-

feurs Local Union, 97 F.Supp. 633, 634 (E.D.Mich.1951).

Defendants also point to the prayers for relief and argue that since in some instances different relief is sought from the various defendants, there are separate causes of action. There are two answers to this argument: (a) plaintiff's cause of action is not made into multiple causes of action by requesting multiple relief and (b) prayers E and G do seek the same relief from all the defendants. In any event, the determining issue is not the relief sought since "the prayer forms no part of the cause of action." Preas v. Phebus, 195 F.2d 61, 63 (C.A.10, 1952). Regardless of the relief requested in the present complaint, the underlying cause of action is a single wrong. It consists of the acts of all the defendants in wrongfully depriving the plaintiff of what he asserts to be his property. Accordingly, § 1441(c) has no application to this case.

Since Caribbean is a Delaware citizen and the complaint asserts a single underlying wrong against all of the defendants, the case is not removable under either § 1441(b) or (c) regardless of plaintiff's citizenship.

In addition, a second, independent ground exists for finding that this case was improvidently removed. As previously noted, the plaintiff has denied that he is a New York citizen and has claimed that he is a citizen of Puerto Rico. The Court therefore conducted a hearing on this issue on February 2, 1971.

Citizenship and domicile are synonymous for purposes of determining diversity jurisdiction. Ellis v. Southeast Construction Co., 260 F.2d 280, 281 (C.A. 8, 1958); Marks v. Marks, 75 F. 321, 324 (C.C.D.Tenn.1896). Diversity of citizenship must exist both at the time of filing the original complaint and at the time of filing the petition to remove. Gibson v. Bruce, 108 U.S. 561, 2 S.Ct. 873, 27 L.Ed. 825 (1883). Any person, sui juris, may make a bona fide change of domicile or citizenship at any

time. Stine v. Moore, 213 F.2d 446, 448 (C.A. 5, 1954). However, one may have only one domicile at a time and once established it persists until a new one is acquired. Desmare v. United States, 93 U.S. 605, 610, 23 L.Ed. 959 (1877). Once acquired it is presumed to continue until it is shown to have been changed. Mitchell v. United States, 88 U.S. (21 Wall.) 350, 353, 22 L.Ed. 584 (1874).

■■■■■ To acquire a domicile of choice, the law requires the physical presence of a person at the place of domicile claimed, coupled with the intention of making it his present home. When these two facts occur, the change in domicile is instantaneous. Intention to live permanently at the claimed domicile is not required. If a person capable of making his choice honestly regards a place as his present home, the motive prompting him is immaterial. Spurgeon v. Mission State Bank, 151 F.2d 702, 705–706 (C.A. 8, 1945), cert. den. 327 U.S. 782, 66 S.Ct. 682, 90 L.Ed. 1009 (1946); Cooper v. Galbraith, Fed.Cas. No. 3,193 (C.C.D.Pa.1819).

■■■ Further, the burden of showing removability, where diversity jurisdiction is challenged, is upon the party seeking to remove. Puritan Fashions Corp. v. Courtaulds Ltd., 221 F.Supp. 690, 696 (S.D.N.Y.1963); Thomas v. General Electric Co., 207 F.Supp. 792, 798 (W.D.Ky.1962); see Industrial Electronics Corp. v. Cline, 330 F.2d 480, 482 (C.A. 3, 1964).

In order to apply the above law and to determine Charles' citizenship and domicile, it is necessary to narrate in some detail the course of his career for many years.

Charles was born in Puerto Rico on August 22, 1922. He moved with his parents to Brooklyn, New York in 1925. In 1930, his family, including Charles, moved and established their home in the State of New Jersey. Charles finished high school in New Jersey in 1940. From 1940 to 1942, he attended Columbia University and from 1942 to 1945 served in the United States military forces at various posts in this country and abroad.

Following his tour of military service in 1945, Charles attended the University of Ohio from which he graduated in 1948 with an electrical engineering degree. He immediately joined the family business firm (Unanue & Sons, Inc.) in New York but continued to reside with his parents in New Jersey until 1951 when he was married.

In 1951 and 1952, Charles and his first wife resided at various apartments in New Jersey while he continued working in New York in the family business. From 1952 to about the middle of 1954, Charles resided and worked in Puerto Rico, supervising and operating the family business interests located there. His move to Puerto Rico was a result of a family business decision. Charles was to supervise the expansion of the Puerto Rican plant and was expected to remain there indefinitely to operate the plant upon its completion. He and his wife lived in a home owned by one of the family companies.

In 1954, these plans were unexpectedly changed. The father-in-law of Joseph (Charles' brother) who lived in Puerto Rico became ill. Joseph's wife wished to be near her father during his terminal illness so it was decided by Charles and his brothers that Charles would return to the United States and Joseph would move to Puerto Rico and take over the operation of the Puerto Rican plants.

It was then that Charles and his wife moved back to the United States and purchased a home in their joint names in Closter, New Jersey. Charles again worked in the New York office of his family's business. This situation continued until 1962.

By 1962, Joseph's father-in-law had died and Joseph's commitment to stay in Puerto Rico during his father-in-law's lifetime had expired. Joseph and his wife were anxious to return to the United States. The family was also contemplating a further expansion of the plants in Puerto Rico. It was agreed that

Charles would move back to Puerto Rico permanently with a view to building up the business operations there since this was expected to be the major growth possibility for the family business. In April 1962 Charles returned to Puerto Rico. In August, his wife and two children joined him there and they moved into a company owned home located at J–7 Geronimo St., Urb. San Francisco, San Piedras, P.R. Their New Jersey home was closed because his wife was opposed to either leasing or selling it. The children attended school in Puerto Rico. Charles registered to vote in the Commonwealth's election and did in fact vote in 1964 and 1968.

This situation remained until August 1965 when a strained relationship developed between Charles and his first wife. She wanted to return to their Closter, New Jersey home so she could be treated by a New York psychiatrist whom she favored. As a consequence, Charles' wife and children returned to New Jersey. Between August and December 1965 Charles spent about half of his time away from Puerto Rico working in the company's office in New York. During this period, when in New York, Charles lived with his family in New Jersey. Charles and his wife finally separated in December 1965.

Following Charles' separation from his wife, he continued to maintain his residence in Puerto Rico at the home provided by the company at the Geronimo Street address. He maintained this home until sometime prior to November 1966. Because of Charles' marital difficulties and the fact that he was spending about half of his time at the New York office, the family, including Charles, decided that his brother, Frank, should move to Puerto Rico and take charge of the day-to-day operation of the Puerto Rican plants. During the time Charles spent in New York in 1966 on company business, he lived at different hotels and the New York Athletic Club. Frank moved to the Geronimo Street address and Charles moved his Puerto Rican home to another company-leased apartment, known as the Borinquen Towers.

In November 1966, upon the advice of the company's counsel, Charles purchased a condominium apartment at 54 Kings Court, Santurce, Puerto Rico and Frank bought the company-owned home on Geronimo Street. Charles' Kings Court home was used by his parents during some of the winter months.

In November 1968, Charles, wanting a home which he could occupy at any time of the year, sold the Kings Court apartment to one of the family companies and purchased a new condominium apartment at 860 Ashford Ave., Santurce, Puerto Rico which he still owns.

As a result of a dispute with his brothers, Charles was expelled from the family business interests in July 1969. From 1966 to July 1969, Charles had served as President of Puerto Rico Food Products Corporation, one of the family businesses, but because Frank had taken over the day-to-day operations of the Puerto Rican plants, Charles divided his time about equally between the New York and Puerto Rican offices.

In February 1967 because of the hotel expenses Charles incurred while working in New York, the family business leased an apartment at 415 East 42nd Street, New York for Charles' use. This arrangement continued until July 1969 when Charles was expelled from the family business and the company stopped paying rent for the apartment.

Sometime around the middle of 1967, Charles obtained a Mexican divorce from his first wife and thereafter on July 21, 1967 entered into a Separation Agreement with her. He married his second wife on November 11, 1967.

From July 1969, when Charles was expelled from the family business, until after this suit was brought in the Court of Chancery and removed to this Court, Charles has been associated with a consulting and advertising firm which provides consulting services to manufacturers, distributors and retail chains interested in expanding sales and profits

in Spanish-speaking consumer areas. His major spheres of business have been centered in New York and Puerto Rico. Consequently, during the period from 1969 to the present he spends about half of his time at his home in Puerto Rico and half at his apartment in New York.

From this narrative of facts the Court must decide whether Charles, at the time this suit was filed and removed to this Court, was domiciled in New York, as the defendants claim, or in Puerto Rico, as Charles contends.

The most logical way to approach this decision is to commence with Charles' last domicile about which there appears to be no dispute and attempt to determine whether in the light of the evidence and applicable rules of law, he later established another domicile.

There appears to be no question that Charles was domiciled in the State of New Jersey between 1954 and April 1962. He and his immediate family lived in a home jointly owned by Charles and his first wife. Charles commuted daily from his home to his New York office. There is absolutely no evidence that during this period any other place than his actual New Jersey residence was his domicile. Without any explanatory evidence, absent in this case, the conclusion is justified that his actual New Jersey home was also his domicile. Ennis et al. v. Smith et al., 55 U.S. (14 How.) 400, 423, 14 L.Ed. 472 (1852); Sherman v. Roosevelt Co., 48 F.Supp. 434, 436 (D.Mass.1943).

It appears equally clear that Charles changed his domicile from New Jersey to Puerto Rico in 1962. At that time as a consequence of a family business decision, Charles moved to Puerto Rico and undertook an expansion of the Puerto Rican businesses. His brother Joseph wanted to return to the United States. Charles established his family in a company-owned home, the children were entered in school and in 1964 Charles registered and voted in Puerto Rico. He filed Puerto Rican citizenship tax returns. He and his brothers expected that he would remain indefinitely in Puerto Rico. This Court concludes that Charles in 1962 acquired a domicile of choice in Puerto Rico. It was the place where he established a new home for himself and his immediate family, where his primary business responsibility was, where he exercised his political right to vote and where he paid Puerto Rican income taxes, required only of its citizens. His physical presence in Puerto Rico coupled, as it was, with his intention of making it his present home converged to establish him as a citizen and domiciliary of Puerto Rico.

Because Charles continued to own the Closter, New Jersey home while in Puerto Rico, his children attended a private, English-speaking school and he and his family lived in a company-owned home, the defendants contend that these facts militate against any inference that Charles established a domicile in Puerto Rico. These facts, however, appear to be insignificant. Charles' wife, who jointly owned the New Jersey home, opposed its sale or lease. Providing company owned or leased homes for company officers appeared to be a well-established general policy of the family businesses until at least 1966. No significance whatsoever can be attached in so far as domicile is concerned whether the children attended a private or public school.

The main dispute between the parties is whether Charles abandoned his domicile in Puerto Rico and established a new domicile in New York after his first wife returned to New Jersey and he separated from her in December 1965. There appears to be no question that since February 1967 Charles has maintained dual residences—a leased apartment in New York and a home in Puerto Rico—and that he and his second wife have lived a part of each year at one or the other homes depending on the demands of his business affairs, which were conducted from both locations.

At the hearing Charles testified that he is a citizen and domiciliary of Puerto

Rico. He is registered to vote there and did in fact cast his ballot in the elections of 1964 and 1968. He has never been registered to vote or voted in any other jurisdiction. For the tax years 1966 through 1969, Charles' Federal income tax returns show his Puerto Rico address; he filed residence tax returns in Puerto Rico which taxes income only of domiciliaries, and for the same years he filed non-resident income tax returns in New York State. He owns his home in Puerto Rico as opposed to the rented apartment in New York.

In support of their position that Charles is a New York citizen, the defendants rely heavily upon three judicial admissions made by Charles in the course of litigation in New York in the period from August 1969 to March 1970.

The first admission occurred when Charles alleged under oath in a New York action for divorce from his first wife, filed in September 1969, that "he has been a resident of the State of New York for more than two years * * *." The defendants properly point out that "residence" as used in the matrimonial statutes of New York means "domicile". See 1 Foster & Freed, Law and The Family—New York § 5:14 (1966).

The other admissions were made by the plaintiff in the course of a related New York action of Caribbean Canneries, Inc. v. Unanue, 99 Civ. 3073, pending in the United States District Court for the Southern District of New York. The first occurred on August 11, 1969, when Charles' answer to the complaint admitted that he "is a citizen of the State of New York". The second admission occurred on March 17, 1970. when during the course of a deposition in the New York litigation, Charles' counsel stipulated on the record that Charles was a New York citizen.

Charles testified that it was not until after these so-called judicial admissions were made, did he understand the legal significance between "residence" and "domicile" and I am inclined to agree that this is the case. The New York di-

vorce action, the second brought against his first wife, referred to Charles as a "resident" and since he was a resident of New York he did not understand that its legal connotation under New York law meant domicile.

The answer to the New York complaint prepared by his attorney and the admission made at deposition by his counsel are explained by the fact that an analysis of Charles' citizenship and domicile had not been investigated to any extent by his counsel at the time these admissions were made. Counsel assumed that because he had a New York address and residence he was a New York citizen. This explanation appears highly plausible. Mere statements in pleadings filed by counsel in earlier, unrelated proceedings do not estop a person from asserting his true citizenship in a later Federal suit where diversity of citizenship is at issue. Reynolds v. Adden, 136 U.S. 348, 351–352, 10 S.Ct. 843, 34 L.Ed. 360 (1890).

The defendants have also pointed out a number of other documents signed by Charles in which a New York residence was cited. However, none of these references to residence necessarily meant domicile.

■ On the basis of the present record, I conclude that Charles' domicile established in Puerto Rico in 1962 is presumed to have continued. The defendants, in my opinion, have failed to prove that Charles abandoned his Puerto Rican domicile and established a New York domicile, a necessary element of proof to sustain the diversity jurisdiction of this Court. See McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 182–184, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

Since the plaintiff is a citizen of Puerto Rico and defendants Frank and Caribbean are also citizens of Puerto Rico, the action is not removable on the basis of diversity jurisdiction.

Accordingly, an order will be entered remanding this action to the Court of Chancery of the State of Delaware in and for New Castle County.