John SUGLOVE and Doreen E.
Suglove, Appellants,

v.

OKLAHOMA TAX COMMISSION,
Appellee.

No. 52688.

Supreme Court of Oklahoma.

Dec. 4, 1979.

Rehearing Denied Jan. 28, 1980.

Thomas M. Affeldt, Morehead, Savage, O'Donnell, McNulty & Cleverdon, Tulsa, for appellants.

Marjorie Patmon, Gen. Counsel, Thomas G. Ferguson, Jr., Oklahoma City, for appellee.

OPALA, Justice:

This appeal raises two issues: [1] Is there sufficient evidence to support Oklahoma Tax Commission's [OTC] finding that appealing taxpayers [a married couple] were "resident individuals" of the state for assessment of income tax? and [2] Does OTC violate equal protection guaranty under the federal and state constitutions by its policy which places upon taxpayers who move to a foreign country the burden of establishing a change of domicile while not imposing a like requirement upon taxpayers moving to another state? Our answer to the first question is in the affirmative and to the second in the negative.

John and Doreen Suglove [taxpayers] resided in the State of Oklahoma until February 1975 when they moved to his job assignment site in Jakarta, Indonesia. They remained in Indonesia until March 1977. Based on their purported domiciliary status in Oklahoma, OTC assessed them additional income tax for 1975. The assessment, paid under protest, resulted in a contest upon taxpayers' claim for refund. This appeal is from OTC's denial of the claim.

I

Taxpayers contend the evidence does not support OTC's order finding them to be Oklahoma domiciliaries for the tax period ending December 31, 1975.

■ Within the meaning of the statute, a "resident" is a "natural person who is domiciled in this state".[1] A person's domicile is the place where he has his true, fixed and permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning.[2] Domicile has been held to form a constitutional basis for the imposition of state income tax on an individual.[3] It has been the subject of much litigation in a variety of contexts.

■ Although at one time there was doubt whether a person could ever change domicile,[4] early in the last century decisions came to recognize that this may be done.[5] Over the years certain principles have evolved in connection with the determination of domicile which harken back to the courts' earlier reluctance to allow a change of domicile. First, a person may have only one domicile at a time.[6] Second, domicile, once fixed, is presumed to continue until a new one is established.[7] Third, to effect a change of domicile, there must be (a) actual abandonment of the first domicile, coupled with (b) the intention not to return to it and (c) actual residence in another place with intention of making it a permanent home.[8] Indicia of a changed domicile are to be found in the habits of the person, his business and domestic relations, declarations, exercise of political rights, community activities and other pertinent objective facts ordinarily manifesting the existence of requisite intent.[9] As a general principle,

1. 68 O.S.Supp.1975 § 2353 provides in part: "4. 'Resident individual' means a natural person who is domiciled in this state, and any other natural person who spends in the aggregate more than seven (7) months of the taxable year within this state shall be presumed to be a resident for purposes of this act in absence of proof to the contrary. A 'nonresident individual' means an individual other than a resident individual."

2. *Jones v. Reser*, 61 Okl. 46, 160 P. 58, 59 [1916]; This classic definition of domicile is found in the initial paragraph of Justice Joseph Story's essay "Domicil". Hogan, Joseph Story's Essay on "Domicil," 35 Bost.U.L.Rev. 215 [1955].

3. *New York ex rel. Cohn v. Graves*, 300 U.S. 308, 313–314, 57 S.Ct. 466, 467–468, 81 L.Ed.

666 [1937]; *Lawrence v. State Tax Comm.*, 286 U.S. 276, 52 S.Ct. 556, 76 L.Ed. 1102 [1932].

4. *Curling v. Thornton*, 2 Addam's Eccl. 6, 19 [1823].

5. *Stanley v. Bernes*, 3 Hagg.Ecc. 373 [1830].

6. *Jones v. Burkett*, Okl., 346 P.2d 338, 341 [1959].

7. *Jones v. Burkett*, supra note 6; *Comptroller of the Treasury v. Lenderking*, 268 Md. 613, 303 A.2d 402, 405 [1973].

8. *Jones v. Burkett*, supra note 6; *Bixby v. Bixby*, Okl., 361 P.2d 1075, 1078 [1961].

9. *Graham v. Graham*, Okl., 330 P.2d 1046, 1048 [1958].

*Oklahoma domicile, once established, is presumed to continue unless an individual can show that a change has occurred.*[10] One's intent with respect to domicile presents a question of fact.[11]

Evidence adduced at the OTC hearing discloses that on February 19, 1975 taxpayers moved from Tulsa to Jakarta, Indonesia on an indefinite job assignment. Before their move, they discontinued telephone service, closed all charge accounts, packed and shipped most of their household and personal effects, and notified business accounts and friends that they would be moving to Indonesia. Upon arriving in Indonesia, taxpayers acquired Indonesian resident status, rented a home, opened a checking account in Jakarta and procured a local driver license. They joined various social and business clubs and, in 1975, they made contributions to several Indonesian charities. In March 1977 taxpayers were notified to make preparation for a long-term assignment in Pakistan. Their move was delayed because of political problems in that country. From March 1977 to August 1978 taxpayer-husband worked in Algeria, Britain and Indonesia, while taxpayer-wife maintained residence in Tulsa. In August of 1978 both moved to Teheran, Iran.

OTC claims that taxpayers have retained their in-state domicile because of certain post-departure contacts with Oklahoma. Taxpayer-husband maintained a checking account at a Tulsa bank, kept current his Oklahoma driver license, stored some personal property in Tulsa and voted there by absentee ballot in the 1976 presidential election.[12] In September of 1977, after taxpayers had returned to Tulsa for a briefing on the next Pakistan assignment, they bought a home there. Taxpayer-wife apparently lived in that home until she joined her husband in Teheran.

OTC relies on these facts as negating the taxpayers' intent to make Jakarta their permanent domicile and as indicative of a pattern one would normally follow when one's occupation requires periodical absences from this country for temporary work assignments abroad.

 OTC criteria for establishing taxpayers' continued in-state domicile might fall short of being legally sufficient and convincing if they included solely those post-departure contacts with our state which are compatible with claimed benefits one would reasonably expect from one's United States' citizenship.[13] A true dual citizenship coexists in nearly every American. This is so because citizenship is expressive both of a legal relation to the Nation as well as to the state.[14] A person may, of course, be a citizen of the United States without being a citizen of any one state.[15] This is, in essence, the legal condition of some persons residing in the District of Columbia, in the territories of the United States and of those citizens who, having abandoned their state domicile, went to reside abroad.[16] A citizen of the United States is a citizen of the state in which he is domiciled.[17] Once a person's domestic domicile ceases and foreign domicile stands established, one then loses state but retains federal citizenship. If the taxpayers' post-departure links with Oklahoma were no stronger than those which coextend with claimed benefits reasonably to be expected

**10.** *McKiddy v. State*, Okl., 366 P.2d 933, 935 [1961]; *Jones v. Burkett*, supra note 6.

**11.** *Box v. State Election Board of Oklahoma*, Okl., 526 P.2d 936, 940 [1974]; *Jones v. Burkett*, supra note 6.

**12.** The record does not reflect that taxpayer-wife, a Canadian citizen, had an Oklahoma driver license.

**13.** *Blanco v. Pan-American Life Insurance Company*, 221 F.Supp. 219, 227–228 [D.C.Fla. 1963].

**14.** *Kitchens v. Steele*, 112 F.Supp. 383, 386 [D.C.Mo.1953].

**15.** *Pemberton v. Colonna*, 189 F.Supp. 430, 431–432 [D.C.Pa.1960], affd. 290 F.2d 220, 221 [3rd Cir. 1961].

**16.** *Albaugh v. Tawes*, 233 F.Supp. 576 [D.C.Md. 1964], affd. 379 U.S. 27, 85 S.Ct. 194, 13 L.Ed.2d 173 [1964].

**17.** *Boyd v. Nebraska*, 143 U.S. 135, 12 S.Ct. 375, 36 L.Ed. 103 [1891].

from incidents of national citizenship, Oklahoma could not rightfully claim them as domiciliaries on that basis alone. Post-departure acts of voting in federal elections and keeping current one's state driver license will not, by themselves and without more, afford a basis for an inference of one's continued in-state domicile.

■■■ While ownership of Oklahoma-situated real estate might ordinarily be viewed as a fairly neutral factor, it could not be so here. Taxpayers' occupancy of their Tulsa property between job assignments provides a very forceful indication of pre-existing and ongoing *animus revertendi.*[18]

■■■ Maintaining a current Oklahoma driver license, in-state voting, having a local bank account, keeping property in storage within the State and ownership of Oklahoma-situated real estate [19]—each perhaps a neutral factor in isolation from others—when all added together show a pattern highly consistent with taxpayers' intent not to abandon their Oklahoma domicile. When all the evidence is considered in its totality there is eloquent support in the record for the presence of *animus revertendi.*

Taxpayers' proof sought to show that their Indonesian life-style was consistent with a permanent domicile there. OTC's evidence, on the other hand, revealed an Oklahoma-related pattern of conduct strongly indicative of *animus revertendi.* OTC's task under the law was to weigh the Indonesian-based facts against their Oklahoma-based counterparts. OTC no doubt decided that the latter were not persuasive-

ly overcome by the former. We find that decision free from legal error.[20]

## II

Taxpayers contend it is the policy of OTC to tax individuals who move to a foreign country differently from those who move to another state and this policy, they say, violates equal protection under the federal and state constitutions. They assert that OTC unlawfully presumes that in-state domicile continues after departure abroad and routinely refuses to concede that an Oklahoma domiciliary may establish a foreign domicile for income tax purposes.

This contention is based in part on an interpretation of testimony by OTC's Income Tax Division Director to the effect that a person who moves overseas "will be taxed as a resident of Oklahoma", while one who moves to another state will be taxed as a part-year resident only. He explained that even though an Oklahoma citizen should establish a true, fixed and permanent home in a foreign country he would nonetheless be taxed as a resident of this State. This testimony tends of course to support taxpayers' contention that OTC does in fact decline to permit one to establish a foreign domicile for income tax purposes.

OTC claims that all persons who move overseas on foreign-situs job assignments are afforded a fair opportunity to appear and present evidence to overcome the inference of their continued in-state domicile. Taxpayers were granted an orderly hearing

**18.** *Animus revertendi* means the intention of returning to one's established domicile. See Black's Law Dictionary, Fourth Edition, p. 114. Taxpayer-husband testified that the home was purchased for investment purposes. The record reflects that taxpayer-wife occupied the home after its purchase in September 1977. As of the date of the OTC hearing [May 16, 1978] both taxpayers were occupying the home while awaiting a definite overseas assignment. Their appellate brief indicated that they left for Teheran three months following OTC hearing [August 1978].

**19.** Although each of these factors occurred at different times, all are relevant in establishing

the Oklahoma domicile and may be considered for that purpose. *Clarkson v. MFA Mutual Insurance Company,* 413 S.W.2d 10, 15 [Mo. App.1967]; *Trumbull v. Trumbull,* 393 S.W.2d 82, 91 [Mo.App.1965].

**20.** *OTC would not have erred if it felt that the acts in Jakarta were simply consistent with the taxpayers' local community obligations and their civic duties in the social fabric of that environment. Membership in a club and participation in other activities are clearly more consistent with civic community obligations than with establishment of a new domicile.*

in this case and had a fair and full opportunity to develop evidence of their claim to nonresident status.

What confronts us for assessment here is [a] an OTC-applied inference from a foreign-situs job assignment that in-state domicile continues until rebutted, coupled with [b] OTC policy which requires only those who move abroad to overcome that inference—a requirement concededly inapplicable to persons moving to another state. Absent contrary indications, the latter are, after their departure, routinely taxed as part-year residents.

 The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution is applicable to state exercise of taxing power.[21] The Constitution does not prohibit reasonable classifications for taxation so long as they rest on a difference having a reasonable relation to the subject of legislation to the end that all persons similarly situated are treated alike.[22] Classifications not manifestly arbitrary or unreasonable are not constitutionally infirm.[23] An invalid classification is that which discriminates between persons or property in like situations, or which is arbitrary, illusory or one that has no fair or substantial relation to the purpose for which it is made.[24] A tax imposed on the basis of an assumed fact which the taxpayer is not allowed to controvert is, of course, arbitrary and unreasonable.[25]

 Applying these general principles to the present case, it is clear that state-made distinctions between those who move abroad and those who move to another state are not constitutionally impermissible so long as there is a reasonable basis for a varying treatment. We hold that a reasonable basis does exist here. Moves from one state to another are a common occurrence today. They are commonly considered to be permanent, or at least for an indefinite time and without intention of returning to the previous domicile. A move from one state to another is an ordinary event. The person remains within the same culture and among people who speak the same language. A person who moves from one state to another is not a foreigner anywhere in the United States. One's friends and family are still within a reasonable distance. In the absence of countervailing factors, it is not unreasonable to infer that such a move is permanent and constitutes a change of domicile.

 On the other hand, a move to a foreign country entails a drastic change in one's life, thus making the intention to stay permanently in a foreign country less likely.[26] Moving to a foreign country means

**21.** *Hartford Steam Boiler Inspection & Ins. Co. v. Harrison*, 301 U.S. 459, 461, 57 S.Ct. 838, 839, 81 L.Ed. 1223 [1937].

**22.** *Nashville, C. & St. L. Ry. v. Browning*, 310 U.S. 362, 368, 60 S.Ct. 968, 972, 84 L.Ed. 1254 [1940].

**23.** *Welch v. Henry*, 305 U.S. 134, 145, 59 S.Ct. 121, 125, 83 L.Ed. 87 [1938].

**24.** *Air-Way Electric Appliance Corporation v. Day*, 266 U.S. 71, 82, 45 S.Ct. 12, 15, 69 L.Ed. 169 [1924].

**25.** *Heiner v. Donnan*, 285 U.S. 312, 52 S.Ct. 358, 76 L.Ed. 772 [1932]; *Schlesinger v. Wisconsin*, 270 U.S. 230, 46 S.Ct. 260, 70 L.Ed. 557 [1926].

**26.** In New York the presumption against a foreign domicile is stronger than the general presumption against a change of domicile. Less evidence is required to establish a change of domicile from one state to another than from one nation to another. *Klein v. State Tax Commission*, 55 A.D.2d 982, 390 N.Y.S.2d 686 [1977] affd. 43 N.Y.2d 812, 402 N.Y.S.2d 396, 373 N.E.2d 290 [1977]; *Moorhouse v. Lord*, 10 H.L.C. 272, 283, 285–287 [1863]; *Bodfish v. Gallman*, 50 App.Div. 457, 378 N.Y.S.2d 138, 140–141 [1976]; *In re Newcomb's Estate*, 192 N.Y. 238, 84 N.E. 950, 954–955 [1908]. Domicile of origin is presumed to continue until a new one is acquired, and the intent to change, especially where such change is to a foreign country, must be established. *In re James' Will* 221 N.Y. 242, 116 N.E. 1010, 1013 [1917]; *Dupuy v. Wurtz*, 53 N.Y. 556, 561 [NY 1873]; *In re Newcomb's Estate*, supra. Although the question of domicile remains one of fact in each case, there still remains a strong presumption against change of domicile in a situation where a person leaves his own country to live or carry on business in another for the "ties of country, of manners and of language might be so strong that one could with difficulty break them altogether." *In re Hoff's Estate*, 178 Misc. 515, 35 N.Y.S.2d 60, 63 [NY 1942].

leaving one's own culture, one's family and friends in a way which most people would be reluctant to do. It is hence not unreasonable to infer that when an individual moves abroad on a foreign-situs job assignment he is not necessarily adopting it as a new domicile.

We therefore hold that there was no federal or state constitutional infirmity[27] in OTC's application to this case of a continued in-state domicile inference vis-a-vis Oklahoma domiciliaries moving abroad on a foreign-situs job assignment.

Affirmed.

LAVENDER, C. J., IRWIN, V. C. J., and WILLIAMS, HODGES, BARNES, DOOLIN and HARGRAVE, JJ., concur.

SIMMS, J., dissents.

SIMMS, Justice, dissenting.

I respectfully dissent. I agree with the Sugloves that the Tax Commission's order finding that they were residents of Oklahoma in 1975 is not supported by the evidence.

In deciding that the Sugloves did not show a change of domicile in 1975, the majority, in my opinion, places far too much importance on the events which took place in 1977. These events are too remote to decide the issue before us—which is whether the Sugloves acquired a new domicile in *1975.*

The majority reasons that because the Sugloves ultimately left Jakarta in 1977, they did not intend in 1975 to make it their domicile. The implication is that in order for a change of domicile to be real and effective, a person must move with the intention of keeping the new domicile forever. This is not a requirement.

*The intention which is important in this case is their intention in 1975.* As the majority points out, to acquire a new domicile, there must be a concurrence of residence in the new locality with the intention to re-

main there (*animus et factum* ). It is the intention at the time of the move which is important (*animus manendi* ).[1]

It is not necessary to the acquisition of a new domicile that the move be made with fixed determination to never leave after arriving; one may entertain a "floating" intention to go elsewhere, even to return to one's original domicile.

Discussing this requisite intention in *Gilbert v. David, 235 U.S. 561, 35 S.Ct. 164, 59 L.Ed. 360,* the Supreme Court stated:

" 'If a person has actually removed to another place, with an intention of remaining there for an indefinite time, and as a place of fixed present domicil, it is to be deemed his place of domicil, notwithstanding he may entertain a floating intention to return at some future period.' 'The requisite animus is the present intention of permanent or indefinite residence in a given place or country, or, negatively expressed, the absence of any present intention of not residing there permanently or indefinitely.' [citations omitted]

\* \* \* \* \* \*

"It is apparent from all the testimony that the plaintiff may have had, and probably did have, some floating intention of returning to Michigan after the determination of certain litigation and the disposition of his property in Connecticut, should he succeed in disposing of it for what he considered it worth. But, as we have seen, a floating intention of that kind was not enough to prevent the new place, under the circumstances shown, from becoming his domicil. It was his place of abode, which he had no present intention of changing; that is the essence of domicil."

In its reasoning, the majority appears to place *too much* emphasis on the word "permanent" as it is used in describing the

---

**27.** We assess the taxpayers' constitutional argument by the commands of Equal Protection Clause in the Fourteenth Amendment to the United States Constitution and by our due process clause in Art. 2 § 7, Okl. Con.

**1.** See, e. g., *Mitchell v. U.S.*, 21 Wall. 352, 22 L.Ed. 587 (1875); *Burke v. Burke*, 119 Okl. 254, 249 P. 1110 (1926).

requisite intention needed to establish a new domicile. As the majority points out, we have used the word as follows:

> "To effect a change of residence or domicile, there must be an actual abandonment of the first domicile, coupled with an intention not to return to it, and there must be a new domicile acquired by actual residence in another place or jurisdiction, with the intention of making the last acquired residence a permanent home." *Jones v. Burkett, Okl., 346 P.2d 338, 341 (1959).*

In this context however, the word means indefinite rather than continuing forever. We have recognized the limitation of the word in this context on numerous occasions. In *Jones v. Reser, 61 Okl. 46, 160 P. 58 (1961)* we set forth the following:

> "There must be a settled, fixed abode, an intention to remain permanently, at least for a time, for business or other purposes, to constitute a residence within the legal meaning of that term."

> "The term 'residence' simply means a settled or fixed abode of a character indicating permanency, at least for an indefinite time. It signifies a party's permanent home and principal establishment, to which, whenever he is absent, he has the intention of returning."

In *Bixby v. Bixby, Okl., 361 P.2d 1075, 1078 (1961)*, we noted that:

> " 'A person does not acquire a new domicile by merely going to another place with the intention of making it his domicile. He must go there not only with that intention, but also with the intention of residing there for a more or less definite time and of making it his home * *'. This is referred to as 'animus'.

> * * * * * *

> " 'Length of residence is not a factor where the act and the intent to acquire a domicile concur.' "

The confusion which sometimes arises from the use of the word permanent in discussing the intention necessary to acquire a new domicile, was discussed at length by the Third Circuit Court of Appeals in *Gallagher v. Philadelphia Transp. Co., 185 F.2d 543 (1950)*, and the following is relevant here:

> "While we concede that there is a good deal of rather ambiguous talk in the cases, some of which might arguably be taken to support this position, we think that it is incorrect. The emphasis of the court on the permanence of the anticipated attachment to a state, in our opinion, required too much of the plaintiff.

> "There is substantial concurrence in the correctness of the negatively stated proposition that is the absence of an intention to go elsewhere which is controlling. [citations omitted] It is enough to intend to make the new state one's home. [citations omitted] It is not important if there is within contemplation a vague possibility of eventually going elsewhere, or even of returning whence one came. [citations omitted] If the new state is to be one's home for an indefinite period of time, he has acquired a new domicile. [citations omitted] Finally, it is the intention at the time of arrival which is important. The fact that the plaintiff may later have acquired doubts about remaining in her new home or may have been called upon to leave it is not relevant, so long as the subsequent doubt or the circumstance of the leaving does not indicate that the intention to make the place the plaintiff's home never existed."

See, also: *Janzen v. Goos, 302 F.2d 421 (8 Cir. 1962); Unanue v. Caribbean Canneries, Inc., 323 F.Supp. 63 (D.C.Del., 1971).*

The Sugloves either had the present intention, the *animus manendi,* to turn their Jakarta residence into their domicile in law or they didn't. I believe the evidence fully supports their contention that they did. They may well have abandoned that domicile in 1977 and acquired a domicile in a foreign country or once again acquired domicile in Tulsa, but that question is not before us.

As I would reverse the Commission's Order, I would not address those arguments concerning the permissibility of a differing standard or burden of proof between per-

sons who claim a new domicile in a foreign country and those who assert such a claim in a sister state.